## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MARK CONNELL,** | ) |
| **RONALD HARRIGAN,** | ) |
| **ERIC LUDWICK,** | ) |
| **EDWARD M. NARUSHOFF** | ) |
| **RICHARD M. WEAVER,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **Civil No. 04-1356** |
| | ) |
| **ANTHONY J. PRINCIPI,** | ) |
| **Secretary of the Department** | ) |
| **of Veterans' Affairs,** | ) |
| | ) |
| **Defendant.** | ) |

## Opinion

Plaintiffs, five male employees of the Veterans' Affairs Medical Center in Pittsburgh,

Pennsylvania, bring this civil rights employment action claiming they experienced a sexually hostile

work environment in violation of Title VII of the Civil Rights Act of 1967 (42 U.S.C. § 2000(e) *et*

*seq.*). Presently before the court is Defendant's Motion for Summary Judgment. For the reasons

stated below we will grant defendant's motion.

## I. BACKGROUND

Plaintiffs are five male current or former employees of the Department of Veteran Affair's

University Drive location, locally known as the Oakland VA, in Pittsburgh, Pennsylvania

(hereinafter referred to as the "VA"). (Compl., at ¶¶ 3, 6.)  Mark Connell has been employed by the

VA as a Radiologic Technologist since April 1992. (Deposition of Mark Connell, August 6, 2006, at 17, attached as Ex. 1 to Defendant's Appendix of Exhibits (Doc. 24).) Ronald Harrigan has been employed by the VA as a Biomedical Engineering Technician since April 1994. (Deposition of Ronald Harrigan, August 7, 2006, at 19, attached as Ex. 2 to Defendant's Appendix.) Eric Ludwick was employed by the VA as MRI Radiologic Technologist from April 26, 1998, until his resignation January 3, 2006. (Deposition of Eric Ludwick, August 3, 2006, at 14, 18-19, attached as Ex. 3 to Defendant's Appendix.) Edward Narushoff has been employed by the VA as a Radiologic Technologist since October 6, 1991. (Deposition of Edward Narushoff, August 8, 2006, at 23, attached as Ex. 4 to Defendant's Appendix.) Richard Weaver has been employed by the VA as a Radiologic Technologist since March 27, 1989. (Deposition of Richard Weaver, August 7, 2006, at 20, attached as Ex. 5 to Defendant's Appendix.)

Plaintiffs' Complaint centers on the conduct of a female co-worker, Janice Freidel, who was employed by the VA as an Ultrasound Technician from April 1999 through May 12, 2003. (Connell Dep., at 19; Harrington Dep., at 21-22; Ludwick Dep., at 22-23; Narushoff Dep., at 27-28; Weaver Dep., at 21-22; EEOC Hearing Testimony, at 230-241, 267-268, 296-297.) Plaintiffs complain that Ms. Freidel engaged in various sexually harassing conduct against them from February 2000 through April 2003. (Compl., at ¶ 9.) According to the Complaint, Ms. Freidel's conduct consisted of the following:

a. Ms. Freidel pursued Mr. Harrigan sexually during 2000 and 2001. When he declined to date her after their ice skating adventure, she felt rejected and stalked him, kicked him on the upper thigh and poured a soft drink over his head. All of the complainants knew of this series of incidents.

b. In June of 2002 Ms. Freidel screamed and yelled at Mark Connell and student observers and a student co-ordinator about being so beautiful that all the females in

2

the department were just fat cows while she is an ice skater and a ballerina. She yelled that she had a black belt in some martial art and could kick the crap out of anyone in the department. She told Mr. Narushoff who tried to calm her down to protect the students that he was going to get his along with everyone else. Jan Gatial (the student co-ordinator from Allegheny County Community College) and Mr. Narushoff, who heard the commotion reported the matter to Ms. Hallie Montgomery (first level supervisor). All the complainants knew of the comments and threats.

c. All plaintiffs were aware that Ms. Freidel told Dr. Mino that she would: cause a bloodbath in the radiology department; that she would kill him; that she would call wives of fellow employees and tell them about sexual affairs of their husbands in the radiology department area; and that she would report those employees for sexually harassing her. The plaintiffs took these threats seriously, particularly after Ms. Freidel made false complaints against some of them which resulted in an administrative investigation by a board of those complaints; thus, carrying out one of the threats.

[c1.] Ms. Freidel threatened to kick employees' testicles. This was known by all employees and was directly made to Mr. Ludwick and Mr. Talento along with a kicking motion toward Mr. Talento's crotch. Again all of the complainants knew of these threats.

[c2.] Mr. Freidel threatened to drive or kick another employees's nose into his brain. Ms. Freidel made these types of threats frequently and was heard to do so by all employees in the radiology area of the hospital.

d. Ms. Freidel told Mr. Ludwick that she wanted him to tell Mr. Harrigan that he was beneath her and she wanted him to cease pursuing her. She said that if he did not cease, she would press charges against Mr. Harrigan and get him fired.

e. Ms. Freidel would stare at the plaintiffs endlessly in a hostile manner. This was observed by all plaintiffs.

f. Ms. Freidel made numerous false complaints about the plaintiffs and others which resulted in an administrative board investigation, the results of which were pending against the plaintiffs from July 2002 until final notification of the board's findings in February of 2003.

g. Ms. Freidel would hide to eavesdrop upon her fellow employees during 2002. Most of the plaintiffs observed this conduct and all heard of it through out the period from June of 2002 to February of 2003, when she was moved to the tenth floor.

3

h. Ms. Freidel attempted to terrorize Mr. Weaver and an elderly veteran patient by approaching them in a rapid and threatening manner with a wheelchair, only swerving off at the last second.

i. Ms. Freidel would walk directly at other employees (Mr. Narushoff and Mr. Ludwick) brushing by them and forcing them to move to get out of her way.

(Compl., at ¶ 9.) Based on this conduct, the Plaintiffs each filed separate charges with the Equal Employment Opportunity Commission in December 2002 and January 2003. (Ex. A to the Complaint.)

None of the Plaintiffs worked directly with Ms. Freidel, except for Mr. Narushoff, who worked with her about two or three times per month when he needed to perform x-rays. (Narushoff Dep., at 29, 37.) Mr. Connell did not have much more than casual contact with Ms. Freidel, and initially his relationship with her was friendly. (Connell Dep., at 18-19.) Mr. Harrigan typically saw Ms. Freidel once a day depending on what machines were broken in the Radiology Department. (Harrigan Dep., at 22-23.) Mr. Ludwick's interaction with Ms. Freidel was normally limited to passing her in the hallway. (Ludwick Dep., at 23.) Mr. Weaver did not have a lot of interaction with Ms. Freidel. (Weaver Dep., at 22-25.)

During the relevant time period, Hallie Montgomery was the Supervisory Radiologic Technologist, with immediate supervisory responsibilities for all Plaintiffs except Mr. Harrigan. (Connell Dep., at 17; Ludwick Dep., at 15; Narushoff Dep., at 26; Weaver Dep., at 20; EEOC Hearing Testimony, May 5, 2004, at 197, 247-248, 304, attached as Ex. 6 to Defendant's Appendix.) These four Plaintiffs' second-level supervisor was Patricia Weihrauch, the Administrative Officer for Imaging; and their third-level supervisor was Mona Melham, M.D., the Associate Chief of Staff and Vice President of the Clinical Support Service Line. (Connell Dep., at

17-18; Ludwick Dep., at 51-52; Narushoff Dep., at 26-27; Weaver Dep., at 20-21; EEOC Hearing Testimony, May 5, 2004, at 197, 247-248, 304.) Mr. Harrigan's immediate supervisor was the Lead Technician, William Francis; his second-level supervisor was the Supervisor of Biomedical Engineering, Paul Hoffman; and his third-level supervisor was the Chief of Facilities management, Robert Callahan. (Harrigan Dep., at 2-21.)

The chronology of the relevant conduct is as follows. In January or February 2000, a group of VA employees traveled to Seven Springs resort for a seafood buffet. (EEOC Hearing Transcript, at 9-10, May 4, 2002, attached as Ex. 1 to Plaintiffs' Brief.) After dinner, the group moved to a club in the resort for dancing, and Ms. Freidel danced with Mr. Harrigan in a suggestive and sexually provocative manner. (Harrigan Dep., at 26-27.) Ms. Freidel's dancing shocked and embarrassed Mr. Harrigan, and had other persons present gaping with their mouth's open at her display. (Harrigan Dep., at 27; EEOC Hearing Testimony, at 10.) The dancing then ceased and everyone went home separately. (Harrigan Dep., at 28.)

A few weeks later, either in February or March 2000, Ms. Freidel asked Mr. Harrigan to go out on a date ice skating. (Harrigan Dep., at 29.) Mr. Harrigan accepted the offer and went on the date with Ms. Freidel. (Harrigan Dep., at 29-30.) Mr. Harrigan learned during this date that he was not at all interested in Ms. Freidel, describing it as his worst date ever. (Harrigan Dep., at 29-30.) After the date, Ms. Freidel asked Mr. Harrigan about going out to do something on several different occasions, but Mr. Harrigan never accepted any of these offers. (Harrigan Dep., at 32.) In May 2000, Mr. Harrigan and Ms. Freidel were engaging in small talk about the Pittsburgh Penguins hockey team in the hall at work when Ms. Freidel poured a can of soda pop over his head and then ran away giggling. (Harrigan Dep., at 41-42.) Ms. Freidel then immediately went to Mr. Ludwick

5

and told him to tell Mr. Harrigan to leave her alone, that she does not date men of Mr. Harrigan's caliber, that she will press charges against him if he continues to pursue her, that she will charge him with sexual harassment, and that she will have his job. (Ludwick Dep., at 29-30, 31; Harrigan Dep., at 45.)

The following Monday morning, Mr. Harrigan went to Ms. Freidel's immediate supervisor, Hallie Montgomery to complain about Ms. Freidel's behavior. (EEOC Hearing Testimony, at 13-14; Harrigan Dep., at 44-45, 49-50.) Ms. Montgomery suggested that Mr. Harrington also state his complaints to Ms. Freidel's second-level supervisor, which he did. (Harrigan Dep., at 44, 48-50.)

In June or July of 2002, Ms. Freidel entered one of two adjoining exam rooms where Mr. Connell, a Community College of Allegheny College {"CCAC") student, and the CCAC Clinical Coordinator were present. (Connell Dep., at 21.) Upon entering the room Ms. Freidel began yelling and screaming for no apparent reason. (Connell Dep., at 21; EEOC Hearing Testimony, at 75.) Ms. Freidel screamed that "everybody is jealous of her because she is so gorgeous, she's a ballerina and an ice skater and a second degree black belt." (EEOC Hearing Testimony, at 75.) In addition, Ms. Freidel stated that "she could probably kick the crap out of anybody in the department." (EEOC Hearing Testimony, at 76.) She also referred to "some of the females in the department as being fat cows." (EEOC Hearing Testimony, at 76.)

Mr. Connell asked Ms. Freidel who the "fat cows" were, and she responded that they were Amy Pillar, "that fucking redhead" Tina Konopski, and Virginia Swetof. (Connell dep., at 24.) Mr. Connell also explained that Ms. Freidel's boast that "she could probably kick the crap out of anybody in the department," referred to the women, not to Mr. Connell. (Connell Dep., at 24.)

6

Mr. Connell did not report this incident to anyone, however the CCAC Clinical Coordinator did report the incident to Ms. Montgomery. (EEOC Hearing Testimony, at 76.)

In early July, 2002, Mr. Ludwick was in the work corridor talking to Tina Konopski about a patient's x-ray films, while nearby Ms. Freidel was talking to another co-worker, Pete Tolento. (Ludwick Dep., at 32.) Mr. Tolento was sitting in a chair and Ms. Freidel was standing; also present at the time were two students, Mary Kay Richards and Julia Perri. (Ludwick Dep., at 32, 38.) Ms. Freidel made a comment to Mr. Tolento about Mr. Tolento's wife "liking it rough." (Ludwick Dep., at 32.) Mr. Tolento's reply to Ms. Freidel was a comment to the effect that "we can ask Dr. Mino if he likes it rough." (Ludwick Dep., at 32.)

Mr. Tolento's reference to "Dr. Mino" concerns Ms. Freidel's past personal dating relationship with another VA employee, Frank A. Mino, M.D., of which Mr. Ludwick was not aware. (Ludwick Dep., at 32.) After Mr. Tolento's comment, Ms. Richard, the CCAC student, stated, "We can always ask Kelly [Binando] about that, because she is back in Dr. Mino's office," apparently referring to Ms. Binando's alleged current personal relationship with Dr. Mino. (Ludwick Dep., at 33.) Ms. Freidel's response to Mr. Tolento's was to threaten to kick Mr. Tolento in the groin accompanied by a kicking motion with her leg. (Ludwick Dep., at 33.) At this point Mr. Ludwick spoke up and said to Ms. Freidel, "Don't go there." (Ludwick Dep., at 33.) Ms. Freidel turned to Mr. Ludwick and stated, "I ought to kick you then." (Ludwick Dep., at 33.) Mr. Ludwick again stated to Ms. Freidel, "Don't go there," and then walked away from the scene. (Ludwick Dep., at 33.)

Ms. Freidel did not kick either of the men, and she did not make a kicking motion with her leg towards Mr. Ludwick. (Ludwick Dep., at 34.) Mr. Ludwick did not report this incident until he

7

was asked to by his supervisor, Ms. Weihrauch, after she learned about it when Ms. Freidel submitted a "Report of Contact," described below, complaining about the incident and accusing Mr. Ludwick of sexual harassment. (Ludwick Dep., at 35-37.) Mr. Ludwick admitted that he "just blew off Ms. Freidel's alleged threat to kick [him]" until Ms. Weihrauch asked Mr. Ludwick to prepare his own "report of Contact." (Ludwick Dep., at 37.)

On July 9, 2002, about 6:30 p.m., Ms. Freidel telephoned Dr. Mino while he was working at the VA. (Email from Frank A. Mino to Patricia J. Weihrauch, July 13, 2002, attached as Ex. 8 to Defendant's Appendix.) Dr. Mino recounted the events of the encounter in an email he wrote at the request of Ms. Weihrauch. (Email from Mino, July 13, 2002, Ex. 8.) In the email, Dr. Mino stated as follows:

While here on call and while reading the afternoon/evening CT scans, I was interrupted by a call to the reading room from technologist Janice Freidel. She was quite agitated and upset and proceeded to scream at me for approximately 20-30 minutes. While not entirely incoherent, the exact nature of her complaint was unclear to me, in spite of the duration of the mostly one-sided conversation. I could however eventually glean that Ms. Freidel was upset with some of her co-workers.

Allegedly, offensive comments were made to Ms. Freidel about her failed past personal relationships by technologist Eric Ludwick. She demanded that I speak to Mr. Ludwick and force him to stop speaking in such a fashion to her. I replied that I had no such authority or influence over Mr. Ludwick, or anyone else here for that matter. I then advised Ms. Freidel to report any inappropriate behavior to her administrative supervisors; specifically, the lead tech, the chief tech and if necessary the administrative officer. She adamantly conveyed her reluctance to do so, based upon the outcomes of previous complaints that she had lodged. I told her then to discuss the matter with the Chief of Radiology. She then asserted that the Chief of Radiology was not an advocate for the women in the department. Furthermore, she claimed that I in fact run the department by "pulling all the strings." I attempted to inform her that I have no "strings" to pull and that the best possible resolution of her complaint would be through the appropriate administrative channels we had previously discussed. She then threatened that "if I did not do something that there would be a BLOOD BATH in the work corridor." She quickly added that she would be contacting the spouses of Mr. Ludwick, Mr. Tedder, Mrs. Greene and a few other

8

staff members to relate to the spouses of these staff, what she considered to be inappropriate behavior.

I then informed Ms. Freidel that I had no further advice to offer and that I must return to my duties here at work. Immediately afterwards I attempted to reach the Chief of Radiology at home, but was not able to convey this incident in detail to her until the next day.

(Email from Mino, July 13, 2002, Ex. 8.)

Ms. Freidel filed a Report of Contact dated July 10, 2002, in which she complained of sexual

harassment and a hostile environment as a result of the behavior of the technologists in the

Radiology Department, Mr. Ludwick's conduct on July 9, 2002, and Dr. Mino's conduct. (Report

of Contact, Janice Lynn Freidel, July 10, 2002, attached as Ex. 7 to Plaintiff's Appendix.)

Ms. Freidel stated that her intention "was to resolve this issue at this level (radiology) and to not be

forced to pursue it at a higher level (either in court or the VA system)." (Ex. 7., at 2.) Ms. Freidel

specifically described the July 9, 2002 incident as follows:

Yesterday afternoon I was walking through the work corridor past Mary [Richards], Pete [Talento] and Eric Ludwick. Pete made some comment to me (we had a good [rapport]) and I pretended to kick him. I said[,] ["]aren't you even afraid? You're not afraid because you know I'm highly skilled as a Second Degree black belt and [have] learn[ed] to come within ½ inch and pull your leg w/o touching the target. That was my control.["]

Eric Ludwick made the comment that he had evidence to the contrary, Dr. Mino. It is no secret that Dr. Mino and I have dated in the past and this would infer that [Dr. Mino] had been discussing me in an intimate way with the males in the department.

Also, Eric stated that Kelly (the student) . . . had spent quite a lot of time with Dr. Mino in his office behind closed doors. . . .

. . . I asked Dr. Mino after the conversation yesterday (7·9·02) if he was aware what [Eric had said about Kelly + him spending a lot of time [together]. [Dr. Mino] . . . denied it.

9

... Based on Dr. Mino's statement Eric Ludwick is making fabrications and innuendo which greatly offend me, . . . .

(Ex. 7, at 3-6.)

On July 11, 2002, Mr. Narushoff witnessed an incident in which Ms. Freidel was first

talking to herself, and then engaging with a student, Mary Kay Richards. (Narushoff Dep., at 55-63,

66; Email from Edward M. Narushoff, July 11, 2002, attached as Ex. 9 to Defendant's Appendix.)

Mr. Narushoff recounted the events of the incident in an email he wrote at the request of

Ms. Weihrauch and the lead technologist at the time, David McBride. (Email from Narushoff, July

11, 2002, Ex. 9.) In the email, Mr. Narushoff stated as follows:

> Ms Friedel [sic] was complaining of her treatment by her fellow technologists
> as to whom or why, I am not sure. But she was stating that she did not care for
> certain things as they were; what was said about her dating Dr. Mino, which she had
> previously discussed openly with most, if not all of the Techs, Dr M[i]no's favorable
> treatment of student Kelly Binando, and . . .what she considered to be lies about
> things in these areas and the treatment of herself as a woman, by everyone in the
> department.
>     I was assigned to Flouro and was observing this from the control room of
> fluro 1. Student MaryKay Richards unhappily chanced to come down the aisle at
> that moment and Ms. Friedel [sic] started to verbally lash out at her for what reason I
> am not sure. But she did mention again the situation between student Kelly and Dr.
> Mino and was telling MaryKay to not to dare to say a thing about this or "she will
> make trouble for her and everyone else in this department."
>     Being the Clinical Co-Ordinater, I felt it necessary to intervene and prevent
> any type of altercation or disturbance from being furthered. At which point Ms.
> Friedel [sic] started to lash out at me, and said that I was no better than the rest of the
> department and that "if people in those back offices who are [in] charge do not do
> anything, then she will take us all to court and we could explain it there, and if that
> wasn't good enough that the EEO should be involved to handle this." She was
> clearly intent on some type of action being taken, but for what reason I could not tell.
> She made several more threats of legal action and that we had all better not make her
> life the focus of department gossip. . . . .

(Email from Narushoff, July 11, 2002, Ex. 9.)

10

On July 18, 2002, Ms. Freidel was placed on an authorized absence pending the results of an investigation by the VA Police Department into alleged statements to co-workers that could be construed as a threatening language. (Memorandum from Janet E. Durick. M.D., Chief of Radiology to Janice Freidel, July 18, 2002, attached as Ex. 10 to Plaintiff's Appendix.) After an initial investigation, the Director of the VA Pittsburgh Healthcare System, Michael Moreland, authorized an Administrative Board of Investigation into Ms. Freidel's "allegations of possible inappropriate Sexual Conduct/behavior and discrimination." (Memorandum from Michael Moreland, August 5, 2002, attached as Ex. 13 to Plaintiff's Appendix.)

The VA Police Department concluded their investigation into the alleged threatening language on August 12, 2002, resulting in Ms. Freidel being authorized to return to work. (EEOC Hearing Testimony, at 202.) She was reassigned to the Pharmacy at her request pending the resolution of the investigation into the allegations regarding sexual harassment and discrimination. (EEOC Hearing Testimony, at 311-312.)

Ten employees of the Radiology Department prepared a Report of Contact dated August 14, 2002, in which the employees complained about Ms. Freidel, in part, as follows:

> We as individuals of the Radiology Department feel physically and emotionally threatened by [the] presence of Janice Freidel. Ms. Freidel has made threatening comments to the degree of violence toward the Radiology Department as a whole (specifically, she stated to Dr. Frank Mino, "there would be a blood bath in radiology").
>
> She also made verbal threats toward individuals and their families with the intention of harm. Ms. Freidel stated that she would not hesitate to contact spouses of the radiology Department employees. She said she would tell them there was adultery being committed between these and other employees of this Department.
>
> Ms. Freidel made specific verbal threats to certain individuals stating she would "kick them". Ms. Freidel also had a discussion with another employee in regard to

11

three female radiology employees stating that she "would kick the three cow's asses".

We believe that these threats made by Ms. Freidel should be taken seriously and feel she is capable of achieving them. We do not doubt that she is capable of telling untruths and distorting encounters.

(Report of Contact, August 14, 2002, attached as Ex. 15 to Defendant's Appendix.) The Report of Contact was signed by three of the current Plaintiffs in this case, three other males from the Radiology Department, and four females from the Radiology Department. (Report of Contact, August 14, 2002, at 2, Ex. 15.)

On August 26, 2002, Ms. Weihrauch notified Ms. Freidel of a proposal to suspend her from her position for seven calendar days based upon her use of threatening language to Dr. Mino and her use of insulting and threatening language to Mr. Talento and Mr. Ludwick. (Letter from Patricia Weihrauch, RD to Janice Freidel, August 26, 2002, attached as Ex. 11 to Defendant's Appendix.)

Also on August 26, 2002, Ms. Freidel filed a Complaint of Employment Discrimination alleging sexual harassment and a hostile work environment, citing her placement on administrative leave, the July 9, 2002 incident, continuing sexual harassment and hostile environment since beginning employment with the VA, and discriminatory reprisal based on the VA's proposed seven-day suspension. (Complaint of Employment Discrimination, August 26, 2002, attached as Ex. 12 to Defendant's Appendix.)

Ultimately, after negotiation with the union, Ms. Freidel was issued reprimands for her use of inappropriate language with regard to her statement to Dr. Mino, and her use of inappropriate language/behavior for her threats to kick Mr. Talento and Mr. Ludwick. (EEOC Hearing Testimony, at 252-254, Ex. 6; Letter from Mona F. Melhem, M.D. to Janice Freidel, October 28,

12

2002, attached as Ex. 19 to Defendant's Appendix.) Ms. Freidel was not disciplined for threatening Dr. Mino because Dr. Mino did not think that she intended to be violent, and Ms. Freidel did not intend it as a threat. (EEOC Hearing Testimony, at 252-254, Ex. 6; Letter from Melhem to Freidel, October 28, 2002, Ex. 19.) In addition, the Administrative Board of Investigation found that Ms. Freidel's allegations of sexual harassment and discrimination to be unsubstantiated. (EEOC Hearing Testimony, at 216-217, 252-254, 308.)

On November 7, 2002, Ms. Freidel was notified that she was cleared to return to duty as an Ultrasound Technologist in the Radiology Program as of November 21, 2002. (Memorandum from Patricia Weihrauch to Janice Freidel, November 7, 2002, attached as Ex. 14 to Defendant's Appendix.) Prior to her return, Mona Melhem, M.D., Vice-President, Clinical Support Service Line, held a meeting in a conference room outside of the Radiology Department. (EEOC Hearing Testimony, at 309-310.) Dr. Melhem invited any interested person to come to the meeting at which she told the attendants that "the board of investigation did not reveal any charges against anybody, the original complaints had been unsubstantiated and there is no records in any of their records of any disciplinary actions or anything that would affect them adversely." (EEOC Hearing Testimony, at 310.) The meeting was attended by both men and women, including most, perhaps all, of the Plaintiffs as well as Linda Faulkner. (Connell Dep., at 55-56; Harrigan Dep., at 100-102; Ludwick Dep., at 85-86; Narushoff Dep., at 115-116; Weaver Dep., at 57-58.) According to Plaintiffs all of those in attendance, both men and women, protested Ms. Freidel's return to work, but the response to these complaints from VA management was the same. (Connell Dep., at 55-56; Harrigan Dep., at 100-102; Ludwick Dep., at 85-86; Narushoff Dep., at 115-116; Weaver Dep., at 57-58.)

13

After Ms. Freidel returned to work, Plaintiffs continued to complain about her conduct, which included threatening or intimidating staring at all five Plaintiffs; hiding and/or eavesdropping on all five Plaintiffs; driving a wheelchair towards Mr. Weaver; and brushing past Mr. Ludwick and Mr. Narushoff. (Connell Dep., at 44-46, 47-49; Harrigan Dep., at 83-86, 88-89; Ludwick Dep., at 72-76, 76-80; Narushoff Dep., at 80, 82-84, 86, 87-93, 95-102; Weaver Dep., at 60-69, 69-73.)

Mr. Connell complained that Ms. Freidel gave him a threatening or intimidating stare on one or two occasions, but he did not report the incidents to any supervisor. (Connell Dep., at 44-46.) One staring occasion was described as a "scowl" lasting about one minute, and the other was described as a "displeased" look lasting for about 30 seconds. (Connell Dep., at 45-46.) Mr. Connell also claimed that he saw Ms. Freidel sitting in a dark changing room on about four or five occasions, but he did not know if she was eavesdropping. (Connell Dep., at 47-49.)

Mr. Harrigan testified that Ms. Freidel "glared" at him "in a very intimidating way" for over thirty seconds on one occasion in September 2002. (Harrigan Dep., at 83-86.) Mr. Harrigan also witnessed Ms. Freidel hiding more than one time in an apparent attempt to eavesdrop. (Harrigan Dep., at 88-89.)

Mr. Ludwick claimed that Ms. Freidel would stare at him in a confrontational manner numerous times with the stares lasting "seconds, not minutes." (Ludwick Dep., at 72-76.) He also saw Ms. Freidel hiding in dark corridors or rooms with the lights off and apparently eavesdropping. (Ludwick Dep., at 78-79.) Mr. Ludwick also complained about Ms. Freidel having once brushed past him in front of the Radiology Department. (Ludwick Dep., at 76-77.)

Mr. Narushoff testified that Ms. Freidel stared at him meanly on about five occasions for two to three minutes after the investigation into Ms. Freidel's alleged sexual harassment claims

14

began, but he could only identify one of these occasions. (Narushoff Dep., at 80, 82-84.)

Mr. Narushoff also claimed that Ms. Freidel hid in closets in order to eavesdrop on him on two occasions during October, 2002. (Narushoff Dep., at 95-102.) He also testified that Ms. Freidel aimed towards him so as to brush up against him on approximately three occasions; however she did not actually touch him. (Narushoff Dep., at 87-93.)

Mr. Weaver testified that Ms. Freidel stared at him with a look of anger on a "handful" of occasions, although not in a sexual manner. (Weaver Dep., at 64-69.) He also testified that he saw Ms. Freidel leave a changing room on two different occasions after she returned to work, apparently hiding and eavesdropping. (Weaver Dep., at 71-72.) Describing a 2003 incident, Mr. Weaver claimed that Ms. Freidel aimed the wheelchair she was pushing directly at Mr. Weaver as he was walking an elderly patient down the hallway until she veered off at the last moment. (Weaver Dep., at 60, 62-63.)

In 2003, Ms. Freidel received a proposed removal for several counts of conduct unbecoming a federal employee, inappropriate behavior, and inappropriate language regarding an incident in which she interrupted an operating room procedure. (EEOC Hearing Testimony, at 230-241, 267-268, 296-297, 313.) Her employment ceased effective May 12, 2003, based on Ms. Freidel's notice of voluntary resignation dated April 28, 2003. (EEOC Hearing Testimony, at 267.)

## II.. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.56(c), Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Summary

15

judgment may be granted only if the moving party establishes that there exists no genuine issue of material fact and that it is entitled to judgment as a matter of law. Id. Summary judgment is appropriate only when the record evidence could not lead a reasonable jury to find for the non-moving party. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248-249 (1986). In evaluating a motion for summary judgment the court does not weigh the evidence or make credibility determinations. Reeves v. Sanderson Plumbing Products, Inc., 120 S.Ct. 2097, 2110 (2000). Rather than evaluating the evidence and determining the truth of the matter, the court determines whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. In reviewing the evidence, the court draws all reasonable inferences in favor of the non-moving party. Reeves, 120 S.Ct. at 1210; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

## III. DISCUSSION

Defendant argues that although Ms. Freidel committed a series of offensive actions against Plaintiffs, this conduct was gender neutral and for the most part directed at both males and females. With regard to conduct directed only at the male Plaintiffs Defendant argues that Ms. Freidel's offensive actions were not motivated based on Plaintiffs' gender; that is, Ms. Freidel lacked the necessary discriminatory animus. Thus, Defendant argues summary judgment should be granted in its favor because Plaintiffs cannot establish that they suffered intentional discrimination or harassment *because of their sex*. We agree.

### A. Hostile Work Environment

Under the United States Court of Appeals' framework for evaluating a gender discrimination claim based on a hostile work environment, Plaintiffs must establish each of the following elements:

(1) Plaintiffs suffered intentional discrimination because of their sex,

16

(2) the discrimination was severe or pervasive,

(3) the discrimination detrimentally affected plaintiffs,

(4) the discrimination would have detrimentally affected a reasonable person of the same sex in like circumstances, and

(5) the existence of respondeat superior liability.

*Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006), citing, *inter alia, Pennsylvania State Police v. Suders*, 542 U.S. 129, 133 (204); *Weston v. Commonwealth of Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001); *Robinson v. City of Pittsburgh*, 120 F.3d 1286,1300-1301 (3d Cir. 1997); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir.1990).

"Hostile work environment harassment occurs when unwelcome sexual conduct unreasonably interferes with a person's performance or creates an intimidating, hostile, or offensive working environment." *Weston*, 251 F.3d at 425-426, citing *Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57, 65 (1986) (quoting 29 C.F.R. § 1604.11(a)(3)). "In order to be actionable, the harassment must be so severe or pervasive that it alters the conditions of the victim's employment and creates an abusive environment." *Weston*, 251 F.3d at 426 (citing *Meritor*, 477 U.S. at 67 and *Spain v. Gallegos*, 26 F.3d 439, 446-47 (3d Cir.1994)). "In determining whether an environment is hostile or abusive, we must look at numerous factors, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance.'" *Weston*, 251 F.3d at 426 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993).

## B. Whether the Offensive and Harassing Conduct was "Based on Sex"

The United States Supreme Court has stated that the "critical issue" based on the text of Title VII, "'is whether members of one sex are exposed to disadvantageous terms or conditions of employment *to which members of the other sex are not exposed*.'" *Oncale v. Sundowner Offshore*

*Services, Inc.*, 523 U.S. 75, 80 (1998) (emphasis added) (quoting *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring)). The Supreme Court explained that "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed at *'discriminat [ion]* ... because of ... sex.'" *Oncale*, 523 U.S. at 80 (emphasis and alteration in original). Moreover, the Supreme Court stated that is has "never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations." *Oncale*, 523 U.S. at 80.

This case presents an almost classic instance of an "equal opportunity" harasser who "is not treating one sex better (or worse) than the other; [she] is treating both sexes the same (albeit badly)." *Holman v. Indiana*, 211 F.3d 399, 403 (7th Cir. 2000). Ms. Freidel harassed co-workers without discrimination, even though some of the instances of harassment involved sexual content or connotations. *See Oncale*, 523 U.S. at 80.

Initially we note that the earliest conduct of Ms. Freidel that Plaintiffs complain of occurred in 2000 and relates only to Mr. Harrigan. During this time period Ms. Freidel shocked and embarrassed Mr. Harrigan by dancing with him in a suggestive and sexually provocative manner after a group dinner at Seven Springs. A few weeks later Mr. Harrigan went on a date with Ms. Freidel. Although she asked him out a few more times, Mr. Harrigan never accepted any of Ms. Freidel's date offers. Within a few months, Ms. Freidel inexplicably poured a can of soda pop over Mr. Harrigan's head and then ran away giggling. She immediately went to Mr. Ludwick to complain about Mr. Harrigan and to threaten that she would press sexual harassment charges against him if he continues to pursue her. Having learned of Ms. Freidel's complaint and threat, Mr. Harrigan complained about Ms. Freidel's behavior to Ms. Freidel's supervisors, but he never

18

filed an Equal Employment Opportunity or Office of Resolution Management complaint regarding Ms. Freidel's conduct. In fact, until the soda pop incident Mr. Harrigan never complained about Ms. Freidel's suggestive dancing or of any of her conduct regarding their date or her attempts to date him again. While he did bring these incidents up after Ms. Freidel actually filed sexual harassment charges against him, it is clear that he failed to exhaust his administrative remedies as to the allegations occurring in 2000.

The events that took place in June and July of 2002 form the great majority of Plaintiffs' complaints about Ms. Freidel. The first such incident occurred when Ms. Freidel complained in a loud voice so that Mr. Connell, a female CCAC student, and the student's female CCAC Clinical Coordinator could hear her. In substance Ms. Freidel complained that "everybody is jealous of her because she is so gorgeous, she's a ballerina and an ice skater and a second degree black belt," EEOC Hearing Testimony, at 75; that "she could probably kick the crap out of anybody in the department," EEOC Hearing Testimony, at 76, specifically referring to women, not to Mr. Connell, Connell Dep., at 24; and that "some of the females in the department [are] fat cows," EEOC Hearing Testimony, at 76, specifically referring to Amy Pillar, "that fucking redhead" Tina Konopski, and Virginia Swetof, Connell dep., at 24. Ms. Freidel's remarks were not directed at Mr. Connell, and were made in the presence of persons of both gender. Moreover, to the extent her remarks are directed at anyone, they are directed at female employees.

The next incident occurred in the presence of two males, Mr. Ludwick, and Pete Tolento (who is not a Plaintiff), and three females, Ms. Konopski, and two CCAC students, Ms. Richard and Ms. Perri. This incident did involve sexual content or connotations as it began with Ms. Freidel commenting about Mr. Tolento's wife "liking it rough." (Ludwick Dep., at 32.) Mr. Tolento

19

responded by making reference to Ms. Freidel's past relationship with Dr. Mino, and Ms. Richard added a speculative comment about Dr. Mino having an alleged current relationship with another CCAC student. (Ludwick Dep., at 32-33.) In response to this, Ms. Freidel threatened, in turn, to kick both Mr. Tolento and Mr. Ludwick in the groin, but she did not do so. (Ludwick Dep., at 33, 34.)

In the above described incident, the only harassing conduct by Ms. Freidel is her threat to kick the men in the groin. However, Mr. Ludwick did not take Ms. Freidel's threat to kick him seriously, admitting that he "just blew off Ms. Freidel's alleged threat to kick [him]" until he was asked by his supervisor to prepare a Report of Contact, only after Ms. Freidel complained about this incident and accused Mr. Ludwick of sexual harassment. (Ludwick Dep., at 35-37.)

The above incident, with its references to Dr. Mino, clearly upset Ms. Freidel as it was the driving force for Ms. Freidel's next series of actions beginning with her July 9, 2002 telephone conversation with Dr. Mino. Ms. Freidel complained to Dr. Mino about comments that Mr. Ludwick had made about Dr. Mino's past relationship with Ms. Freidel, and about comments that Mr. Ludwick had made about Dr. Mino's alleged current relationship with a CCAC student. (Ex. 7, at 3-6.) Dr. Mino reported that Ms. Freidel urged him to use his authority to stop Mr. Ludwick from making such comments, to which Dr. Mino responded by stating that he had no authority to order anyone to do anything. (Email from Mino, July 13, 2002, Ex. 8.) Dr. Mino then explained that Ms. Freidel threatened that if Dr. Mino "'did not do something that there would be a BLOOD BATH in the work corridor'" and that Ms. Freidel "would be contacting the spouses of Mr. Ludwick, Mr. Tedder, Mrs. Greene and a few other staff members to relate to the spouses of

these staff, what she considered to be inappropriate behavior." (Email from Mino, July 13, 2002, Ex. 8.)

There is no dispute that Ms. Freidel's threat to contact spouses was directed at both men and women. Likewise, her threat of a "blood bath" was not directed solely at males. Although it could be interpreted that the "blood bath" threat was meant to be solely directed at Dr. Mino, the record evidence shows that Plaintiffs as well as other employees viewed the threat as pertaining to employees in general, male and female. (Report of Contact, August 14, 2002, Ex. 15; Connell Dep., at 28, Harrigan Dep., at 57-58, Ludwick Dep., at 39, 41; Narushoff Dep., at 55; and Weaver Dep., at 39.) To the extent that her "blood bath" threat was a violent threat directed at Dr. Mino, we note that he did not view it as a real threat to do violence. (EEOC Hearing Testimony, at 225, 253-254; Letter of Reprimand from Melham to Freidel, October 28, 2002 (noting that the threat towards Dr. Mino was "not intended as a threat.")

In addition, viewed in the context of her complaints to Dr. Mino, it is difficult to characterize her threats as based on Dr. Mino's gender. Her threats instead appear to be based on Dr. Mino's failure to assert his alleged authority as demanded by Ms. Freidel. Dr. Mino reported that Ms. Freidel was upset with some of her co-workers and she asked Dr. Mino to do something about it. Dr. Mino explained that he had no authority to do what she asked and also "advised Ms. Freidel to report any inappropriate behavior to her administrative supervisors; specifically, the lead tech, the chief tech and if necessary the administrative officer." (Email from Mino, July 13, 2002, Ex. 8.) In response, Ms. Freidel basically explained that she did not want to follow Dr. Mino's suggested procedure as it had failed her in the past. It was then that Ms. Freidel stated that if Dr. Mino does not do something then there would be a "blood bath" in the corridor, after which she "quickly

21

added" that she would be contacting employees' spouses. Thus, in context, Ms. Freidel's threats were not based on gender and were directed at both genders.

Ms. Freidel followed up her July 9, 2002 telephone conversation with Dr. Mino by filing a Report of Contact on July 10, 2002, alleging that she was the victim of sexual harassment and a hostile environment. The next day, Mr. Narushoff observed Ms. Freidel complaining to no one in particular about how badly she was treated and of the recent events that prompted the filing of her complaint. (Narushoff Dep., at 55-63, 66; Email from Edward M. Narushoff, July 11, 2002, attached as Ex. 9 to Defendant's Appendix.) When a female CCAC student, Mary Kay Richards, happened to walk down the hallway Ms. Freidel began to "verbally lash out at her." (Email from Narushoff, July 11, 2002, Ex. 9.) In part, she warned Ms. Richards to not talk about any of this or else Ms. Freidel "will make trouble for her and everyone else in this department." (Email from Narushoff, July 11, 2002, Ex. 9.) When Mr. Narushoff intervened, Ms. Freidel lashed out at him, complained about the non-action of the "people in those back offices," and made a general threat of her desire, in Mr. Narushoff's words, to "take us all to court." (Email from Narushoff, July 11, 2002, Ex. 9.) Again, this incident shows that Ms. Freidel was an equal opportunity harasser who did not discriminate between men and women when she verbally lashed out at both a man and a woman, or when she threatened legal action against a group of employees that included both men and women.

Ms. Freidel was put on authorized absence status while the VA Police Department investigated the statements she made to Dr. Mino, and the statements she made to Mr. Ludwick and Mr. Talento. After the VA Police Department concluded its investigation, ten employees of the Radiology Department prepared a Report of Contact dated August 14, 2002, in which the employees

22

complained about Ms. Freidel's harassing and threatening conduct made against both males and females. These employees stated that they all felt "physically and emotionally threatened by [the] presence of Janice Freidel." The employees viewed Ms. Freidel's threat of a "blood bath" as a threat of "violence toward the Radiology Department as a whole," not just men. (Report of Contact, August 14, 2002, attached as Ex. 15 to Defendant's Appendix.) As noted, this Report of Contact was signed by six males (three of whom are Plaintiffs) and four females. Again, not only is Ms. Freidel's conduct objectively directed at both genders but also the employees themselves viewed her threats and harassment as aimed at both genders.

After the several investigations were concluded and Ms. Freidel was authorized to return to work Dr. Melhem held an open meeting in the Radiology Department. At this meeting, both men and women employees protested Ms. Freidel's return to work. (Connell Dep., at 55-56; Harrigan Dep., at 100-102; Ludwick Dep., at 85-86; Narushoff Dep., at 115-116; Weaver Dep., at 57-58.) Despite complaints from both men and women employees about Ms. Freidel returning to work in the Radiology Department, Dr. Melham did nothing. Again, this meeting shows that both men and women complained about Ms. Freidel's offensive and harassing conduct.

In addition, Ms. Freidel's conduct directed solely at men does not show that she was motivated by her victim's male gender. As noted, her threats to kick "Plaintiffs" in the groin occurred only with respect to Mr. Ludwick, which he did not take seriously. In addition, the threat occurred in the context of the July 9, 2002 conversation with Mr. Tolento in which Ms. Freidel's past relationship with Dr. Mino was brought up. Her threat to kick Mr. Ludwick in the groin arose out of her being upset about the subject matter of the conversation (albeit involving implied sexual

23

content), not because of a gender based animus towards males or Mr. Ludwick. *Oncale*, 523 U.S. at 80.

Likewise, we do not find that there is a gender based animus in Ms. Freidel's conduct after she returned to work. This conduct consisted of staring at all five Plaintiffs in a threatening or intimidating manner; hiding and/or eavesdropping on all five Plaintiffs; steering a wheelchair towards Mr. Weaver; and brushing past Mr. Ludwick and Mr. Narushoff. (Connell Dep., at 44-46, 47-49; Harrigan Dep., at 83-86, 88-89; Ludwick Dep., at 72-76, 76-80; Narushoff Dep., at 80, 82-84, 86, 87-93, 95-102; Weaver Dep., at 60-69, 69-73.) The record evidence does support that Ms. Freidel's behavior was based on personal conflicts with the Plaintiffs, not based on their male gender. There is no evidence that there was any sexual connotation in the complained of conduct. With regard to the staring, the Plaintiffs variously characterized it as threatening, intimidating, a scowl, a "displeased" look, a very intimidating glare, a confrontational stare of a few seconds, a mean stare, and a look of anger. While such conduct could have a connection to gender-based discrimination none of the Plaintiffs offered any testimony to show that the staring in fact was done because they were male, rather than because Ms. Freidel had a conflict with each of them.

Finally, Plaintiffs also argue that Ms. Freidel's filing of false charges of sexual harassment against four of the Plaintiffs is "a form of gender specific abuse with threatens their employment." (Plaintiffs' Brief in Opposition, at 17.) However, merely falsely accusing someone of sexual harassment does not state a claim that Plaintiffs themselves were the victim of gender based discrimination. *Balazs v. Liebenthal*, 32 F.3d 151, 155 (4th Cir. 1994).

Our review of the record evidence shows that Ms. Freidel's offensive and harassing conduct was either directed at both men and women or lacked the necessary gender based discriminatory

24

animus. "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed at *'discriminat [ion]* ... because of ... sex.'" *Oncale*, 523 U.S. at 80 (emphasis and alteration in original). Because Plaintiffs have failed to show that Ms. Freidel's conduct was based on sex, they cannot prevail. Accordingly, we will grant Defendant's motion for summary judgment and dismiss this action.

## IV. Conclusion

There is no question that Ms. Freidel engaged in offensive and harassing conduct. However, summary judgment in favor of Defendant in this case is warranted because there is no genuine issue of material fact. Plaintiffs were not discriminated against because of their sex. Plaintiffs "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] ... because of ... sex.'" *Oncale*, 523 U.S. at 81. Plaintiffs cannot show that Ms. Freidel's harassing and threatening conduct was because of their male gender. Accordingly, Plaintiffs have failed to establish a Title VII violation.

An appropriate Order will be entered.

Nov. 5, 2007

Date

Maurice B. Cohill, Jr.,

Maurice B. Cohill, Jr.,
Senior District Judge

25